## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| WALLACE J. DESMARAIS, JR., On Behalf of Himself and All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> FIRST NIAGARA FINANCIAL GROUP, INC., NATHANIEL D. WOODSON, G. THOMAS BOWERS, GARY M. CROSBY, GEORGE M. PHILIP, CARL A. FLORIO, PETER B. ROBINSON, CARLTON L. HIGHSMITH, ROXANNE J. COADY, AUSTIN A. ADAMS, and SUSAN S. HARNETT <br><br> Defendants. | Case No. _____ <br><br> **CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934** <br><br> **JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Wallace J. Desmarais, Jr. ("Plaintiff"), through his undersigned counsel, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.      This is a stockholder class action brought by Plaintiff on behalf of himself and the other public stockholders of First Niagara Financial Group, Inc. ("First Niagara" or the "Company") (other than Defendants outlined below) against the Company and its Board of Directors (the "Board" or "Individual Defendants") in connection with the October 30, 2015 entry by First Niagara into a definitive merger agreement (the "Merger Agreement"), pursuant to which it will merge with and into KeyCorp, with KeyCorp continuing as the surviving corporation (the "Merger" or "Proposed Transaction"). Plaintiff asserts claims against First Niagara and the Individual Defendants for violations of Sections 14(a) and 20(a) of the Securities

Exchange Act of 1934 ("Exchange Act") (15 U.S,C. §§78n(a), 78t(a), and United States Securities and Exchange Commission ("SEC") Rule 14a-9).

2.      Pursuant to the terms of the Merger Agreement, First Niagara shareholders will receive $2.30 in cash and 0.68 shares of KeyCorp common stock for each share of First Niagara that they own.  According to Defendants, based on the closing price of KeyCorp common stock on October 29, 2015, this per share consideration is valued at $11.40 per share (the "Merger Consideration"). This Merger Consideration is inadequate and undervalues the Company.  It fails to adequately value the Company's recent financial performance, despite a troubling interest rate environment, is well below analyst estimates, and fails to adequately compensate shareholders for the synergies that KeyCorp will reap from the consummation of the Proposed Transaction.

3.      The Proposed Transaction is further marred by a flawed process and conflicts of interests, not the least of which is that some of the directors will receive windfall profits not shared by non-insider shareholders. To secure these benefits, the Individual Defendants (as defined herein) further exacerbated their breaches of fiduciary duty by agreeing to certain deal protection devices in the Merger Agreement that will prevent other bidders from making successful competing offers.  These include:

- a termination fee provision whereby the Board agreed that First Niagara would pay KeyCorp a termination fee of up to $137.5 million if it terminates the Proposed Transaction;

- a strict no-solicitation provision that effectively precludes the Board from attempting to maximize shareholder value by soliciting bids from any other potential acquirer, requires that the Board cease certain existing communications and negotiations after a certain time, and limits the ability of the Board to negotiate a superior proposal with a competing acquirer, thereby prohibiting it from fulfilling its fiduciary duties, in

violation of the law; and

- an information rights provision that requires the Company to notify KeyCorp of certain unsolicited competing offers and provide KeyCorp with information regarding such offers.

These provisions substantially and improperly limit the Board's ability to investigate and pursue superior proposals and alternatives and, absent judicial intervention, guarantee the consummation of the Proposed Transaction.

4.     Finally, the Individual Defendants authorized the release of the Form S-4 Registration Statement filed with the Securities and Exchange Commission on or about November 30, 2015, which contained a preliminary proxy statement for Williams' stockholders, (the "Proxy Statement" or "Proxy").  In violation of Sections 14(a) and 20(a) of the Exchange Act, the Proxy contains incomplete and materially misleading information regarding the process leading to the consummation of the Merger Agreement, including: (i) the process leading to the Proposed Transaction, (ii) the financial analyses conducted by J.P. Morgan Securities LLC ("J.P. Morgan"), financial advisor to First Niagara, and (iii) the projections used by J.P. Morgan in those analyses.  Perhaps most notably, the Proxy fails to disclose the any information whatsoever regarding the identity of or analyses performed by a private consultant hired by the Board to assess the Company's standalone value and upon whom the Board specifically relied in deciding to dell the Company.

5.     For these reasons and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to First Niagara stockholders before the vote on the Proposed Transaction or, in the event the Proposed Transaction is consummated, recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

6.　　This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder and Section 20(a) of the Exchange Act.

7.　　Personal jurisdiction exists over each Defendant either because the Defendant is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

8.　　Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue had an effect in this District; and (ii) First NIagara is incorporated in this District.

## PARTIES

**A.　Plaintiff**

9.　　Plaintiff is, and at all relevant times was, a continuous shareholder of First Niagara.

**B.　Defendants**

10.　　Defendant First Niagara Financial Group, Inc. (previously defined as "First Niagara") is a corporation organized and existing under the laws of the State of Delaware with its principal executive offices located at 726 Exchange Street, Suite 618, Buffalo, New York 14210.

11.　　Defendant Gary M. Crosby has served as the President and Chief Executive Officer ("CEO") of First Niagara, and as one of its directors, since December 2013.  Mr. Crosby also previously served as the interim President and CEO from March 2013 to December 2013

and as the Company's Executive Vice President and Chief Administrative and Operating Officer from July 2009 to March 2013.

12.     Defendant Nathaniel D. Woodson has served as the Chairman of the First Niagara Board since April 2014 and as a director of the Company since April 2011.

13.     Defendant G. Thomas Bowers has served as a director of the Company since January 2003.  Mr. Bowers also previously served as Chairman of the Company's Board from October 2007 to April 2014.

14.     Defendant George M. Philip has served as a director of the Company since 2007.

15.     Defendant Carl A. Florio has served as a director of the Company since January 2009.

16.     Defendant Peter B. Robinson has served as a director of the Company since March 2011.

17.      Defendant Carlton L. Highsmith has served as a director of the Company since April 2011.

18.     Defendant Roxanne J. Coady has served as a director of the Company since April 2011.

19.     Defendant Austin A. Adams has served as a Director of the Company since July 2014.

20.     Defendant Susan S. Harnett has served as a director of the Company since January 2015.

21.     Defendants Crosby Woodson, Bowers, Philip, Florio, Robinson, Highsmith, Coady, Adams, and Harnett form the Board of Directors of First Niagara and are collectively referred to herein as the "Board" or the "Individual Defendants." Each of the Individual

Defendants at all relevant times had the power to control and direct First Niagara to engage in the misconduct alleged herein.

## CLASS ACTION ALLEGATIONS

22.     Plaintiff brings this Action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public stockholders of First Niagara (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

23.     This action is properly maintainable as a class action.

24.     The Class is so numerous that joinder of all members is impracticable. As of October 23, 2015, there were approximately 354,786,193 outstanding shares of First Niagara common stock.  The actual number of public shareholders of First Niagara will be ascertained through discovery.

25.     Questions of law and fact are common to the Class, including, among others: (i) whether Defendants have misrepresented or omitted material information concerning the Proposed Transaction in the Proxy in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder; (ii) whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and (iii) whether Plaintiff and other members of the Class will suffer irreparable harm if the Proposed Transaction is consummated as presently anticipated.

26.     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff has the same interests as the other members of the Class.  Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

27.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

28.     Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class.  Therefore, final injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

### A.      Corporate Background

29.     First Niagara, through its wholly owned subsidiary, First Niagara Bank, N.A., is a multi-state, community-oriented bank with approximately 390 branches, $39 billion in assets, $28 billion in deposits, and 5,300 employees providing financial services to individuals, families, and businesses across New York, Pennsylvania, Connecticut, and Massachusetts.

30.     KeyCorp is a financial services holding company that operates through its subsidiaries, including KeyBank National Association, to provide retail and commercial banking, commercial leasing, investment management, consumer finance, and investment banking products and services to individual, corporate, and institutional clients.

### B.      Process Leading to the Proposed Transaction

31.     In the second quarter of 2015, the Board hired J.P. Morgan to review the Company's strategic alternatives.   On July 29, 2015 the Board authorized and directed management and J.P. Morgan to begin to explore a potential sale of the Company.   This

authorization included the contact of three financial institutions: KeyCorp, "Party A," and "Party B."

32.     J.P. Morgan contacted all three parties and, on August 27, 2015, each party provided oral indications of interest ("IOI") to J.P. Morgan.  According to the Proxy, these "indications implied[] a range of indicative values of $10 to $11.50 per share of First Niagara common stock at such time." The Proxy's failure to delineate the specific terms of each proposal or each proposal's respective indicative value.

33.     On September 9, 2015, the Board decided to invite Party C to the bid process after it had "express[ed] interest in a potential transaction with First Niagara." The Proxy fails to disclose whether this "expressed interest" was unsolicited, or solicited, but in a manner different from the approach used to engage KeyCorp, Party A, and Party B. The Proxy also fails to disclose the terms of Party C's IOI or its implied value.

34.     Also on September 9, the Board authorized the formation of a transaction committee comprised of Individual Defendants Nathaniel Woodson, Austin Adams, and Carl Florio (the "Transaction Committee"). It does not appear that the Transaction Committee retained independent financial or legal counsel.

35.     During the week of September 13, 2015, KeyCorp, Party A, and Party C executed confidentiality agreements with waiveable standstill provisions with First Niagara.

36.     On September 19, 2015, J.P. Morgan received an oral IOI from Party C, which implied an indicative valuation range of $10.50 to $11.50 per share of Company common stock at that time ("September 19 Proposal").

37.     On September 22, 2015, various media resources reported that an industry publication had reported that First Niagara was working with J.P. Morgan to evaluate strategic

alternatives. First Niagara does not appear to have publicly acknowledged the process or invited interests from other parties.

38.    "On or about September 22, 2015," Party B informed J.P. Morgan that it had decided to withdraw its initial IOI and not to participate further in the bid process. The Proxy's failure to disclose the exact timing of this communication is curious in light of the media reports on the same day.

39.    On October 1, 2015, according to the Proxy,

> First Niagara engaged a nationally recognized, third party consultant (which we refer to as the "Consultant") to perform an estimated analytically-derived **valuation of First Niagara on a standalone basis using information provided by First Niagara**, publicly available information and the Consultant's business judgment. The Consultant utilized various methodologies and analyses in order to estimate a range of First Niagara's valuation as a standalone entity. **The Consultant also assessed**, based upon previous merger transactions in the industry, **potential share price volatility** if the First Niagara Board of Directors were to publicly announce that First Niagara would remain independent. **The Consultant additionally reviewed certain strategic initiatives previously evaluated by First Niagara management and presented other potential balance sheet restructuring and strategic actions that First Niagara could take to improve its earnings.** [Emphasis added.]

The Proxy fails to disclose, even in general terms, the identity of the Consultant, its compensation amount, or any information of any kind regarding the results of its analyses.

40.    On October 6, 2015, KeyCorp, Party A, and Party C submitted updated, non-binding IOIs.  KeyCorp's proposal provided for a fixed aggregate consideration of $784 million in cash and 235.875 million KeyCorp common shares, representing an indicative value of $11.00 per share based on Key Corp's closing stock price of $13.29 as of October 5, 2015 ("KeyCorp's October 6 Proposal").  Notably, KeyCorp's proposal also provided that First Niagara's outstanding preferred stock would be converted into preferred stock of KeyCorp with substantially the same terms and that all First Niagara's outstanding equity awards would be

converted into equity awards based on KeyCorp common shares.  The Proxy does not disclose if any of the directors own this preferred stock.

41.     Party A's proposal provided for merger consideration with an indicative value of $9.75 to $10.50 per share of First Niagara common stock based on Party A's closing stock price as of October 5, 2015 ("Party A's October 6 Proposal"). Party C's proposal provided for merger consideration that mirrored its September 19 Proposal, with an indicative value of $10.50 to $11.50 per share of First Niagara common stock based on Party C's closing stock price as of October 5, 2015 ("Party C's October 6 Proposal").  Notably, Party C's proposal indicated a value greater than that which the board was ultimately able to extract in its Merger Agreement. The Proxy fails to disclose whether and to what extent the proposals of KeyCorp and Party A included an indicative value that was greater or less than that which was offered previously by the respective parties.

42.     On October 12, 2015, the Board met.  During this meeting – and after a presentation by the Board's disclosed financial advisor, J.P. Morgan – the unidentified Consultant presented to the Board "regarding the Consultant's **estimated valuation and related analyses**" (emphasis added).  According to the Proxy, "[t]he First Niagara Board of Directors **took into account a range of considerations, including the Consultant's analyses, and determined that First Niagara's estimated standalone valuation was likely to be materially lower than any of the proposals from the bidders**, and that the potential decline in share price upon an announcement that First Niagara would remain independent was likely to be immediate and material" (emphasis added).  **In other words, the Board specifically relied upon the Consultant's financial analyses in deciding to sell the Company.**  To this end, at the conclusion of the meeting, the Board instructed J.P. Morgan to invite all three bidders to continue to the second round of the bid process.

43. On October 15, 2015, Party C – which had submitted the highest value IOI thus far – informed First Niagara and J.P. Morgan that it had decided to withdraw its proposal and not to participate further in the bid process. The Proxy does not disclose the reason for Party C's sudden withdrawal.

44. On October 16, 2015, KeyCorp provided a revised draft of a merger agreement to First Niagara. Thereafter, discussions between the remaining bidders continued and the parties began to negotiate the terms of the potential transaction including, among other items, "post-close governance matters and the treatment of, and compensation and benefits to, continuing employees of the surviving company." Then, on October 25, 2015, KeyCorp and Party A delivered revised drafts of the merger agreement to be considered with each of the proposals to be submitted by KeyCorp and Party A the following day. **Notably, the draft provided by KeyCorp included, amongst other things, "requirements" for KeyCorp to add three counsel members of the First Niagara Board reasonably acceptable to KeyCorp to the KeyCorp Board of Directors.** It would appear that Party A's proposal did not include a similar provision. The Proxy fails to disclose when continued employment of First Niagara management and/or board members was first raised, by whom, and what discussions were had regarding these critical topics.

45. On October 26, 2015, KeyCorp and Party A submitted final non-binding IOIs. KeyCorp's proposal provided for merger consideration consisting of a fixed exchange ratio of .680 KeyCorp common shares and $2.30 in cash for each share of outstanding First Niagara common stock, which represented an indicative value of $11.49 per share based on KeyCorp's closing stock price of $13.52 as of October 23, 2015. Party A's proposal provided for merger consideration representing an indicative value of $11.05 per share based on Party A's closing stock price as of October 23, 2015.

46.     On October 27, 2015, First Niagara informed Party A that it was pursuing a transaction with another party, and discussions between First Niagara and Party A with respect to a potential transaction ceased. The Proxy fails to disclose why no attempt was made to extract more value from Party A prior to First Niagara's unilateral termination of negotiations.

47.     Following a meeting of the Board on October 29, 2015, and after finalizing the merger agreement, First Niagara and KeyCorp executed the Merger Agreement on October 30, 2015.

**C.     The Proposed Transaction**

48.     On October 30, 2015, First Niagara issued a press release announcing the Proposed Transaction, which provides in pertinent part:

### KeyCorp to Acquire First Niagara Financial Group

*Powerful Combination Creates High-Performing Regional Bank With Compelling Shareholder Returns*

*Significant Synergies Provide for Stronger Financial Performance and Improved Efficiency*

*Becomes 13th Largest U.S. Commercial Bank with Enhanced Presence in Northeast and Mid-Atlantic*

*Expects Acquisition to be Accretive to EPS in 2017*

**October 30, 2015 - Cleveland, Ohio** KeyCorp (NYSE: KEY) and First Niagara Financial Group (NASDAQ: FNFG) announced today that they have entered into a definitive agreement under which KeyCorp will acquire First Niagara in a cash and stock transaction for total consideration valued at approximately $4.1 billion.

First Niagara headquartered in Buffalo, N.Y., has $39 billion in assets and $29 billion in deposits and 394 banking offices in New York, Pennsylvania, Connecticut and Massachusetts. With approximately $135 billion of assets, the combined bank will be the 13th largest commercial bank headquartered in the U.S.

The combination will create a leading regional bank with enhanced scale to serve three million clients across diverse markets in the Northeast, Mid-Atlantic, Midwest and Pacific Northwest. The acquisition will make KeyCorp a leading bank in Upstate New York, with a strong market presence in Buffalo, Albany,

Syracuse and Rochester. KeyCorp will also expand its operations to attractive markets throughout Pennsylvania, Massachusetts and Connecticut.

Under the terms of the agreement, which was unanimously approved by the Boards of Directors of each company, the merger consideration will be approximately $4.1 billion. First Niagara shareholders will receive 0.68 KeyCorp shares and $2.30 in cash for each First Niagara common share. The per share consideration is valued at $11.40 per share based on the closing price of KeyCorp common stock on October 29, 2015. In conjunction with the closing of the transaction, three members of the First Niagara Board of Directors are expected to join the KeyCorp Board, which will be expanded accordingly.

"Key and First Niagara are a powerful combination, driven by a shared commitment to the clients and to the communities we serve," said KeyCorp Chairman and CEO Beth Mooney.  "This transformational opportunity will bring compelling and complementary capabilities to our shared 3 million clients, while driving meaningful synergies and enhancing shareholder value.  KeyBank and First Niagara both have values-based cultures and a long-term commitment to and experience with the region"

"I am confident that the combination of First Niagara and Key will benefit our shareholders, customers and the communities we serve and will build off the great progress that the First Niagara team has made," said Nathaniel D. Woodson, Chairman of the Board of Directors of First Niagara. "We believe that this partnership provides significant value for our shareholders and allows them to participate in the upside potential of the combined Key and First Niagara."

"I am incredibly proud of all that my team has accomplished to put our customers at the center of all we do," said Gary M. Crosby, President and CEO of First Niagara. "Combining our strengths with those of Key will enable us to even better serve customers with a broader set of product features and functionality, while providing our team members with expanded opportunities as part of a larger, more-diversified organization. Key shares our values and our culture of diversity, inclusion and community service - I look forward to working with their team to ensure a seamless integration of our businesses for the benefit of all of our stakeholders."

"We have known First Niagara for a long time and have always been impressed by the quality of their people and their commitment to the community. We look forward to welcoming First Niagara clients and employees to Key," said Mooney.

Importantly, the compelling financial rationale for the transaction provides significant upside potential for shareholders of both companies. The acquisition diversifies KeyCorp's loan portfolio, strengthens its core retail deposit franchise and provides expanded scale. Upon completion of the transaction, the combined company will have approximately $99.8 billion in deposits, $83.6 billion in loans and 1,366 branches across 15 states. The combined company will have approximately $135 billion of pro forma assets providing increased operating

leverage to deliver improved financial performance.

Shareholders of both companies will benefit from annual cost savings in excess of $400 million from maximizing efficiencies of technology infrastructure, procurement savings across the combined organization, and optimizing overlapping branches. The combined bank will be better positioned to generate attractive financial returns for shareholders through improved efficiency, strong returns on capital and earnings accretion. Finally KeyCorp will maintain its strong capital position, enabling the company to continue to return capital to shareholders.

KeyCorp expects the acquisition to be accretive to earnings per share in 2017, excluding one-time charges, and expects the transaction to deliver an attractive Internal Rate of Return of approximately 15%.

KeyCorp and First Niagara have built a legacy of philanthropy and civic involvement and will continue this commitment to the markets the combined company will serve. Together, the combined companies have nearly $5 billion in lending and investments supporting underserved individuals and communities. Additionally, Key will make a $20 million contribution to the First Niagara Foundation to continue its important community initiatives.

Upon closing the transaction, KeyCorp expects to successfully integrate First Niagara into its business.  KeyCorp and First Niagara have the shared expertise, the culture and the capital to ensure a successful transition.  Christopher M. Gorman, President of Key Corporate Bank, will lead the merger integration team which will be comprised of both KeyCorp and First Niagara team members. "Chris is a dynamic, client-centric leader who is credited with successfully leading, integrating, transforming, and growing businesses throughout his 30-year career in financial services," said Mooney.

The acquisition is subject to customary closing conditions, including regulatory approvals and approval by KeyCorp and First Niagara shareholders. The transaction is expected to close in the third quarter of 2016.

**D.** **The Proposed Transaction Does Not Provide Adequate Value to Shareholders.**

49.     As noted above, pursuant to the terms of the Merger Agreement, First Niagara shareholders will receive a value of approximately $11.40 for each share of First Niagara common stock that they own (previously defined as the "Merger Consideration").  This Merger Consideration is inadequate and undervalues the Company.  It fails to adequately value the Company's recent financial performance, despite a troubling interest rate environment, is well below analyst estimates, and fails to adequately compensate shareholders for the synergies that

KeyCorp will reap from the consummation of the Proposed Transaction.

50.     In March 2013, Defendant Crosby was named the Company's interim President and CEO, and, in December 2013, he was formally named to both jobs.  In the years prior to his appointment, First Niagara had gone through period of rapid growth, nearly quadrupling in size in less than three years.  Shortly after Defendant Crosby's permanent appointment, in January 2014, he announced a "Strategic Investment Plan" that represented a pivot in the Company's strategic imperatives by choosing to collectively accelerate certain investments in its business. The plan was designed to play out over a three- to four-year period, at the end of which the objective was to be better positioned to (1) deliver greater fee generation and revenue capabilities; (2) improve operating leverage by lowering integration costs of new systems and our overall cost to serve; (3) address growing industry wide regulatory imperatives such as cybersecurity; and (4) improve the Company's overall financial returns. The total cash spend for these investments was then estimated to be between $200 million and $250 million.

51.     In the year and a half after that plan was implemented, and despite a challenging interest rate environment, the Company posted increasing financial results.  For example, on January 23, 2015, the Company reported its financial results for the fourth quarter of 2014.  For the fourth quarter, and despite the significant capital spend associated with the Strategic Investment Plan, the Company reported GAAP net income available to common shareholders of $70.0 million (or $0.20 per diluted share), compared to $70.1 million (or $0.20 per diluted share) for the quarter of 2013.  In connection with these results, Defendant Crosby stated:

> During the fourth quarter, our core business fundamentals remained strong as evidenced by our 7% annualized loan growth, 18% transactional deposit growth, and outstanding credit metrics. **We also just completed a comprehensive top-to-bottom re-design of our organization structure in order to streamline our company**, be even more responsive to our customers and ultimately deliver a truly differentiated customer experience. This simplification of our organization structure reduced the number of

management positions we will need going forward and together with other expense savings, we expect to limit our year-over-year increase in operating expenses to less than 1% in 2015. We have redeployed a portion of these savings to pay for other investments in our business. **I'm also pleased with the progress we have made in implementing our Strategic Investment Plan, which will better enable us to better serve customers. As 2015 begins, our Strategic Investment Plan continues to be on track, on budget and we are already beginning to see some of the benefits from those investments.**

52.     Shortly thereafter, on February 24, 2015, the Company noted that these results were in reality better than previously reported.  Specifically, on that date, the Company revealed that its management had preliminarily determined that the Company's allowance for loan and lease losses for the period ending December 31, 2014 and disclosed in the Company's January 23, 2015 press release was overstated due to the misconduct of a mid-level employee. Correcting the overstatement of the allowance would have the cumulative effect of increasing the Company's retained earnings over those periods while reducing the allowance as well as the coverage ratios.

53.     Then, on April 24, 2015, when the Company reported its financial results for the first quarter of 2015, and again despite the costs associated with the Initiative, the Company reported GAAP net income available to common shareholders of $43.8 million (or $0.12 per diluted share), compared to $52.7 million (or $0.15 per diluted share) for the first quarter of 2014. Excluding certain non- operating restructuring items incurred during the first quarter of 2015, operating net income available to common shareholders was $54.7 million (or $0.15 per diluted share), compared to $61.0 million (or $0.17 per diluted share) in the first quarter of 2015. In connection with these results, Defendant Crosby stated:

> Our first-quarter results demonstrate our strong core business fundamentals and the progress we are making to provide a faster, easier, simpler and more secure banking experience for our customers, which will drive increased value for our shareholders. We recently launched our new Online Deposit Account Opening

> solution which enables our customers to choose the products they
> want and open their accounts using their mobile, tablet or desktop
> devices. Early customer experience shows account opening rates
> that are two times greater than our previous experience.

Speaking to the results of the Initiative, Gregory W. Norwood, the Company's Chief Financial

Officer, further noted:

> Compared to the prior quarter, total operating expenses declined
> 2% reflecting strong expense management more than offsetting
> seasonal pressures from certain expense items such as payroll
> taxes. Salaries and benefits expenses also decreased 5% from the
> year-ago quarter driven primarily by the previously disclosed
> Organization Simplification initiative. Average consumer checking
> deposit balances increased 11% annualized sequentially driven
> both by balance growth and new customer acquisition.

54.     And, on July 24, 2015, the Company released its financial results for the second

quarter of 2015.  For that quarter, the Company reported GAAP net income available to common

shareholders of $53.5 million (or $0.15 per diluted share), compared to $43.8 million (or $0.12

per diluted share) for the first quarter of 2015.   In connection with these sequential results,

Defendant Crosby stated:

> We had solid execution in the second quarter reflecting adherence
> to our prudent credit underwriting practices and progress in
> implementing our strategic investment plan, which remains on-
> time and on-budget. Our team is focused on providing a faster,
> easier, simpler and more secure banking experience, and our
> customers are responding well. I'm especially proud of our recent
> recognition by the Reputation Institute as the number four most-
> reputable bank based on customer feedback. In particular, we
> received high scores for innovation, citizenship and product
> quality. Customer-centricity is the heart of our strategy and culture.
> Every decision we make and every action we take are with our
> customers, and ultimately our shareholders, top-of-mind and we're
> gratified to see those efforts recognized by the people we serve.

Mr. Norwood further noted:

> Compared to the prior quarter, revenues increased as most
> noninterest income categories benefited from strong customer
> activity as well as seasonal strength. In our commercial lending
> business, we ended the quarter on a strong note with period-end

commercial business (C&I) balances increasing 9% annualized from the prior quarter benefitting from strong activity in June. Importantly, our loan pipeline at the end of the quarter also was robust. Sequentially, average consumer deposit balances increased 5% annualized driven by interest-checking and money market deposit balances. Net interest margin of 3.02% was in line with our expectations.

55.     On or about September 22, 2015, unconfirmed reports that the Company may be

seeking to sell itself began to circulate in the press.  On the following day, Macquairie Research

opined that the Company's "shares could be worth $10-$12 in a takeout scenario," Boenning &

Scattergood opined that "the ultimate value will be in the $12.00 per share range," PiperJaffray

stated that it saw "potential fair value in the $11-$13 range," Evercore ISI stated that its estimate

was that the stock "could garner $10-$12 in a sale."   As things developed, these ranges

increased.  On October 1, 2015, Compass Point Research & Trading LLC valued the shares

"based on a $13 sale of the bank."

56.     On October 23, 2015, the Company reported its financial results for the third

quarter of 2015, during which it realized GAAP net income available to common shareholders of

$52.9 million (or $0.15 per diluted share), compared to $53.5 million (or $0.15 per diluted share)

for the previous quarter.  Commenting on these results, but not the rumors of a sale, Defendants

Crosby stated:

> In the third quarter of 2015, our business fundamentals were strong, as evidenced by a 10% annualized increase in average transactional deposits and 10% increase in commercial business loans. We also continued to make great progress in implementing our strategic investments, which remain on-time, on-budget and are focused on delivering enhanced products and services, based on customer preferences. As we roll-out these enhancements, I also am very pleased with the customer experience that our team is delivering and the positive brand recognition that it is creating for First Niagara across the markets we serve. In a recent J.D. Power Survey, 92% of our branch customers said that they would be 'likely advocates' of First Niagara as a banking partner to their friends and family – a number that puts us among top financial institutions with best-in-class customer experience.

57.     On the same day as these results were released, Compass Point Research & Trading LLC reiterated its Buy rating and "value[d] the shares based on the sale of the bank at approximately $13 ($12.86-$14.05)," stating further: "At a time when acquirers are seeking deposit-rich franchises, FNFG offers an attractive footprint with a clean balance sheet and a desirable loan/deposit ratio of 82% (core mix of 86%, costing 14bps). We reiterate FY15E at $0.60, revise FY16E from $0.65 to $0.64, and introduce FY17E of $0.72."

58.     As the announcement of the Merger Agreement neared, analysts' estimates remained above the ultimate Merger Consideration.  For example, on October 26, 2105, Wells Fargo Securities valued the Company at "just under" $12.00 per share, and, On October 29, 2015, stated that "we continue to view $12/sh as a likely price."  Indeed, even after the Proposed Transaction was announced, analysts noted their surprise at the low price.  For example, on October 30, 2015, and commenting on the Merger Consideration, Boenning & Scattergood stated: "As such, we are downgrading our rating on shares of FNFG from Neutral to Underperform.  Our $11.40 target price represents the price implied upon the deal announcement."

59.     In short, the Merger Considerations simply do not adequately compensate First Niagara shareholders for the inherent value of the Company itself.

60.     The Merger Consideration also does not adequately value the profitability and market position that Keycorp will reap from the consummation of the Proposed Transaction.  For example, according to Defendants, the Proposed Transaction will make KeyCorp a leading bank in Upstate New York, with a strong market presence in Buffalo, Albany, Syracuse, and Rochester, and will allow KeyCorp to expand its operations to attractive markets throughout Pennsylvania, Massachusetts, and Connecticut.  What is more, the Proposed Transaction will diversify KeyCorp's loan portfolio, strengthen its core retail deposit franchise, and provide

expanded scale. Upon completion of the transaction, the combined company will have approximately $99.8 billion in deposits, $83.6 billion in loans and 1,366 branches across 15 states. The combined company will have approximately $135 billion of pro forma assets providing increased operating leverage to deliver improved financial performance.

61.     Defendants expect **annual cost savings in excess of $400 million** from maximizing efficiencies of technology infrastructure, procurement savings across the combined organization, and optimizing overlapping branches. KeyCorp further expects the Proposed Transaction to be accretive to earnings per share in 2017, excluding one-time charges, **and expects the transaction to deliver an attractive Internal Rate of Return of approximately 15%.**   The Merger Considerations simply do not adequately compensate First Niagara shareholders for these synergies.

**E.     The Proposed Transaction Is the Result of a Flawed Process**

62.     The insufficient consideration contemplated by the Proposed Transaction is the result of a flawed and conflicted process.   For example, while all outstanding First Niagara restricted stock units ("RSUs")will be converted into restricted stock units in KeyCorp for a number of whole KeyCorp common shares for those RSUs subject to a performance vesting condition, in whole or in part, such vesting condition shall be deemed satisfied at the target performance level.   What is more, as noted above, at least three of the Individual Defendants will be appointed to the KeyCorp board of directors, and those appointees will be chosen by the current Individual Defendants themselves.

**F.     The Merger Agreement Contains Onerous Deal Protection Devices.**

63.     The Proposed Transaction is also unfair because, as part of the Merger Agreement, the Board agreed to certain onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction a *fait accompli* and ensure that no

successful competing offers will emerge for the Company.

64.     Despite the unfair price, the Merger Agreement has a number of provisions that make it more difficult for another buyer to purchase the Company, and for the Company to seek out competing offers.  Specifically, if the Company terminates the Proposed Transaction, the Merger Agreement states that the Company must pay Keycorp a $137,500,000 termination fee. That means that, if any competing bidder wished now to submit a competing bid, it would first have to pay a naked premium of $137,500,000 – or approximately $0.39 per share – just to do so.

65.     Additionally, the Merger Agreement contains a strict no-solicitation provision, pursuant to which the Company is prohibited from soliciting competing acquisition proposals or, subject to certain exceptions regarding unsolicited proposals, engaging in discussions or providing information in connection with an alternative acquisition proposal.

66.     The Merger Agreement also contains an information rights provision that requires the Company to notify Keycorp of certain unsolicited competing offers and to provide Keycorp with information regarding such offers.

67.     As a result of these provisions, even if a competing bidder were inclined to pay $137.5 million for the privilege of bidding on First Niagara, it would be faced with two additional hurdles: (1) negotiations with a Board that chose to enter into a Merger Agreement with KeyCorp; and (2) a material informational and negotiating disadvantage, as the specifics of its bid would be relayed to KeyCorp in real time, while any matching or topping bid by KeyCorp would not be reciprocally relayed back to it.  In other words, in addition to paying a $212.5 million fee just to bid on TECO, any such competing bidder would be required to bid in the dark and against itself.

68.     These provisions and agreements will cumulatively discourage other potential bidders from making a competing bid for the Company.  Similarly, these provisions and

agreements make it more difficult for the Company and individual shareholders to exercise their rights and to obtain a fair price for the Company's shares.

**G.     The Defendants Are Withholding Material Information from Shareholders.**

69.     Finally, the Individual Defendants caused First Niagara to file the Proxy with the SEC in connection with the Proposed Transaction.   As discussed below and elsewhere herein, the Proxy omits material information that must be disclosed to First Niagara's stockholders to enable them to render an informed decision with respect to the Proposed Transaction.

**1.     The Proxy Statement fails to adequately describe the process that resulted in the Proposed Transaction and the conflicts of interest infecting it**

70.     The Proxy Statement fails to fully and fairly disclose certain material information concerning the Proposed Transaction, including (among other things):

a.  The specific terms of each proposal received by the Company on August 27, 2015 and each proposal's respective indicative value;

b.  Whether Party C's "expressed interest" was unsolicited, or solicited, but in a manner different from the approach used to engage KeyCorp, Party A, and Party B;

c.  The terms of Party C's September 9, 2015, IOI or its implied value.

d.  The identity of the Consultant and its compensation;

e.  Any information of any kind regarding the results of the Consultant's analyses;

f.  Whether any of the Individual Defendants own preferred stock in First Niagara;

g.  Whether and to what extent the October 6, 2015 proposals of KeyCorp and Party A included an indicative value that was greater or less than that which was offered previously by the respective parties;

     h.   The reason for Party C's sudden withdrawal;

     i.   When continued employment of First Niagara management and/or board members was first raised, by whom, and what discussions were had regarding these critical topics; and

     j.   Why no attempt was made to extract more value from Party A prior to First Niagara's unilateral termination of negotiations;

71.    These omissions are material because, without the omitted information, First Niagara's public stockholders are unable to assess whether the Board maximized stockholder value, whether other bidders may be willing to pay more for the Company, whether the Individual Defendants reasonably canvassed the market for potential acquirers of First Niagara, whether the Individual Defendants conducted a process that was fair, whether the Individual Defendants secured value commensurate with the standalone value of First Niagara, and the conflicts infecting the process that was conducted.

**2.    The Proxy Statement fails to disclose material facts concerning J.P. Morgan's Fairness Opinion**

72.    The Proxy Statement describes the fairness opinions and the various valuation analyses performed by J.P. Morgan.  However, the description of the opinions and analyses fails to include key inputs and assumptions underlying the analyses. Without this information, First Niagara's stockholders are unable to fully understand or independently recreate the analyses and, thus, are unable to determine what weight, if any, to place on the fairness opinion in determining how to vote in connection with the Proposed Transaction.

73.    As an initial matter, the Proxy states:

    Certain of the financial analyses are presented on an equity value per share basis. In arriving at equity value per share for First Niagara and KeyCorp, the share count in all cases when J.P. Morgan derived an equity value per share was based, in the case of First Niagara, on First Niagara management's estimate of First Niagara's fully diluted shares outstanding

as of September 30, 2015 of approximately 354.8 million and, in the case of KeyCorp, on KeyCorp management's estimate of KeyCorp's fully diluted shares outstanding as of September 30, 2015 of approximately 836.3 million with diluted share count in each case calculated using the treasury stock method of net share settlement for outstanding options.

However, the Proxy fails to indicate the implied value of the offer to First Niagara on a per-share basis or to detail the calculation of equity value (at the unaffected price for both First Niagara and KeyCorp and at the offer for First Niagara). Further, of pricing multiples were calculated, they must be disclosed as well.

74.     Specifically, in connection with J.P. Morgan's *Public Trading Multiples Analysis* of First Niagara, the Proxy Statement fails to:

    a.   Disclose the objective selection criteria;

    b.   Disclose the observed company-by-company pricing multiples (or at least observed ranges) and other financial metrics examined by J.P. Morgan;

    c.   Disclose whether other multiples were examined;

    d.   Quantify and explain the adjustment J.P. Morgan made for M&T Bank Corporation;

    e.   Describe the regression analysis used by J.P. Morgan, including the regression formula, the regression's summary statistics (*e.g.*, p-value, r-squared, or adjusted r-squared, etc.), and any other pertinent information; and

    f.   Clarify how the regression analysis informed J.P. Morgan's selection of a range of TBV multiples.

75.     In connection with J.P. Morgan's *Dividend Discount Analysis* of First Niagara, the Proxy Statement fails to:

    a.   Explain the source of projected figures from 2020-2026, and disclose those projections;

    b.  Explain why the range of P/E multiples applied to determine terminal value was lower than that used in J.P. Morgan's *Public Trading Multiples* analysis;

    c.  Explain J.P. Morgan's pessimistic choice of zero dividend growth for First Niagara, especially in light of growing assets and income in the projections highlighted on page 62 of the Proxy and the substantial dividend growth for KeyCorp highlighted on page 68 of the Proxy;

    d.  Disclose whether the discount rate used by J.P. Morgan is based on WACC or cost of equity;

    e.  Identify the assumptions (e.g., beta, market risk premium, etc.) used to estimate First Niagara's discount rate and quantify and provide the basis for each assumption;

    f.  Indicate the basis for the assumption of 9.0% Tier 1 common equity and clarify that this is 9.0% of total assets; and

    g.  Disclose the implied perpetuity growth rates corresponding to the assumed terminal pricing multiples.

76.    In connection with J.P. Morgan's *Precedent Transactions Analysis*, the Proxy Statement fails to:

    a.  Disclose the objective selection criteria used by J.P. Morgan;

    b.  Display the observed transaction-by-transaction enterprise values, pricing multiples (or at least observed ranges), and other financial metrics examined by J.P. Morgan; and

    c.  Disclose whether other multiples and/or transaction premiums were examined.

77.    In connection with J.P. Morgan's *Public Trading Multiples Analysis* of KeyCorp, the Proxy Statement fails to:

- 25 -

    a.   Disclose the objective selection criteria used by J.P. Morgan;

    b.   Display the observed company-by-company pricing multiples (or at least observed ranges) and financial metrics examined by J.P. Morgan;

    c.   Disclose whether other multiples examined;

    d.   Quantify and explain the adjustments made by J.P. Morgan for M&T Bank Corporation and BB&T Corporation;

    e.   Describe the regression analysis, including the regression formula, the regression's summary statistics (e.g., p-value, r-squared or adjusted r-squared, etc.), and any other pertinent information; and

    f.   Clarify how the regression analysis informed J.P. Morgan's selection of a range of TBV multiples.

78.    In connection with J.P. Morgan's *Dividend Discount Analysis* of KeyCorp, the Proxy Statement fails to:

    a.   Disclose KeyCorp's projected figures through 2026;

    b.   Explain why the range of P/E multiples applied to determine terminal value was lower than that used in J.P. Morgan's *Public Trading Multiples Analysis*;

    c.   Disclose whether the discount rate was based on WACC or cost of equity;

    d.   Identify the assumptions (e.g., beta, market risk premium, etc.) used to estimate KeyCorp's discount rate and quantify and provide the basis for each assumption;

    e.   Indicate the basis for the assumption of 10.0% Tier 1 common equity, its eventual decline to 9.0%, and the reason such decline isn't assumed to commence until 2020; and

    f.   Disclose the implied perpetuity growth rates corresponding to the assumed

terminal pricing multiples.

79.     In connection with J.P. Morgan's *Value Creation Analysis*, the Proxy Statement fails to quantify and explain "transaction-related expenses," identify whether these the same as the "restructuring charges" mentioned earlier in the analysis, and, if not, quantify and explain the "restructuring charges."

**3.     The Proxy Statement fails to disclose material facts concerning the financial projections prepared by the Company's management.**

80.     Finally, the Proxy Statement provides a series of projections, but fails to disclose all of the metrics usually associated with such projections.  Specifically, in connection with the financial projections provided by First Niagara's management and relied upon by J.P. Morgan for the purposes of its analyses, the Proxy fails to disclose the following metrics:

      a.     Common and preferred dividends;

      b.     Tangible book value of equity;

      c.     Goodwill and intangible assets; and

      d.     Dividends; and

      e.     Synergies

81.     What is more, the Proxy fails to disclose the 1-tear dip in Common Equity Tier 1 (from 9.0% to 8.8% in 2018) in the table on page 62 of the Proxy.  The Proxy also fails to define "Common Equity Tier 1.

82.     The Proxy also represents that J.P. Morgan "reviewed certain financial analyses and forecasts prepared by or at the direction of the management of First Niagara . . . ."  But the Proxy fails to explain the distinction regarding analyses and forecasts prepared "by" management, from those prepared "at the direction of" management.  Further, if two sets of projections were prepared, both must be disclosed.

83.     In a similar vein, the Proxy discloses that First Niagara's projection reflect

management's expectation of "lower-for-longer" interest rates and low-growth economic environment.  But the Proxy fails to disclose what the projections are "lower" than and suggest that the projections used by J.P. Morgan are a "base case" set of projections.  Obviously, if another set of projections were produced or used, they must be disclosed.

84.     Finally, the Proxy does not disclose in any way the projections for KeyCorp used by J.P. Morgan in its analyses.

85.     These omissions are material because, without this information, First Niagara's stockholders are unable to fully understand or recreate these analyses and, thus, are unable to determine what weight, if any, to place on the fairness opinion in determining how to vote.

86.     The Proxy is materially incomplete and misleading because it omits the information identified above.

87.     For the reasons detailed herein, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Company stockholders will continue to suffer absent judicial intervention.

## COUNT I

**On Behalf of Plaintiff and the Class Against**
**First Niagara and the Individual Defendants for Violations of Section 14(a)**
**of the Securities Exchange Act of 1934 and Rule 14a-9 Promulgated Thereunder**

88.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

89.     Defendants have issued the Proxy with the intention of soliciting stockholder support for the Proposed Transaction.  Each of the Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, among other things, the process that led to the Proposed Transaction and the key inputs and assumptions of the financial analyses performed by J.P. Morgan in support of its fairness opinion.

90.     In so doing, defendants made untrue statements of fact and omitted state material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).

91.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that such communications with stockholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

92.     Specifically, and as detailed above, the Proxy violates Section 14(a) and Rule 14a-9 because it omits material facts concerning: (i) certain material information regarding the process leading up to the consummation of the Merger Agreement; (ii) key inputs and assumptions underlying J.P. Morgan's financial analyses; and (iii) the projected financial information relied upon by J.P. Morgan in its financial analyses supporting its fairness opinion.

93.     Moreover, in the exercise of reasonable care, the Individual Defendants knew or should have known that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading.  The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Proxy states that J.P. Morgan reviewed its financial analyses with the Board and that the Board considered the financial analyses provided by J.P. Morgan in its fairness opinion.  The Individual Defendants knew or should have known that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.

94.     The misrepresentations and omissions in the Proxy are material to Plaintiff, who will be deprived of his right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.  Plaintiff has no adequate remedy at law.   Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**On Behalf of Plaintiff and the Class Against the Individual Defendants
for Violations of Section 20(a) of the Securities Exchange Act of 1934**

95.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

96.     The Individual Defendants acted as controlling persons of First Niagara within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of First Niagara, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.

97.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

98.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act

violations alleged herein, and exercised the same.  The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were, thus, directly involved in the making of this document.

99.      In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

100.      By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

101.      As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

102.      Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.      Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representatives and Plaintiff's counsel as Class counsel;

B.      Enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

C.      In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff and the Class;

D.      Directing Defendants to account to Plaintiff and the Class for damages sustained because of the wrongs complained of herein;

E.      Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

F.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.


December 30, 2015                              Respectfully submitted,


                                              **FARUQI & FARUQI, LLP**

                                              */s/ James R. Banko*
                                              James R. Banko (#4518)
                                              Derrick B. Farrell (#5747)
                                              20 Montchanin Road, Suite 145
                                              Wilmington, DE 19807
                                              Tel: (302) 482-3182
                                              jbanko@faruqilaw.com

                                              *Attorneys for Plaintiff*

**OF COUNSEL:**

**KAHN SWICK & FOTI, LLC**
Michael J. Palestina, Esq.
206 Covington Street
Madisonville, LA 70447
Tel.: (504) 455-1400
Fax: (504) 455-1498
E-mail: Michael.Palestina@ksfcounsel.com

**FARUQI & FARUQI, LLP**
Juan E. Monteverde
James M. Wilson, Jr.
369 Lexington Avenue, 10th Fl.
New York, NY 10017
Tel.: (212) 983-9330
Fax: (212) 983-9331

*Attorneys for Plaintiff*